**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| JUDITH GARNER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   No. 4:20CV85 JCH |
| | ) |
| VENDTECH-SGI, LLC, | ) |
| | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM AND ORDER**

This matter is before the Court on Defendant's Motion for Partial Summary Judgment, filed March 10, 2021. (ECF No. 43). The motion is fully briefed and ready for disposition.

**BACKGROUND**

Defendant VendTech-SGI, LLC ("Defendant" or "VT-SGI") is a limited liability company, organized under the laws of the State of Kansas, with its principal place of business in the State of Kansas. (Defendant's Statement of Uncontroverted Material Facts in Support of its Motion for Summary Judgment ("Defendant's Facts"), ¶ 1). At all times since at least August 1, 2016, VT-SGI has been party to a Statement of Work with the Division of Homeland Security, Federal Protective Service, to provide armed security via Protective Security Officers ("PSO") at approximately sixty federal buildings in the four state area of Missouri, Iowa, Nebraska, and Kansas. (*Id.*, ¶¶ 2, 3). Before VT-SGI can offer employment to a candidate for a PSO position, and place him/her on a post, VT-SGI must request approval from and authorization by DHS/FPS. (*Id.*, ¶ 4). Prior to requesting such approval from DHS/FPS, the candidate must meet certain minimum qualifications, including firearm qualifications, established by the Statement of Work

and VT-SGI's own hiring criteria. (*Id.*).

Prior to submitting her application for employment with Defendant, Plaintiff was employed by the City of Woodson Terrace, Missouri, as a Police Officer. (Defendant's Facts, ¶¶ 10, 12). On or about April 8, 2016, Woodson Terrace furnished Plaintiff with her discharge letter, which stated that she was terminated, effective April 7, 2016, for "2 independent reasons, either one of which, standing alone, warrants termination, and both of which, taken together, also warrant termination." (*Id.*, ¶¶ 13, 14, quoting Defendant's Exh. U, Bates 110). The two reasons justifying Plaintiff's discharge were her "false allegation that someone in the Department deliberately cut [her] ballistic vest on or about Dec. 11, 2015", and her "….failure to prepare a report, etc., regarding the attempted burglary at 4307 Boswell." (*Id.*, ¶ 15, quoting Defendant's Exh. U, Bates 110-111).

On April 21, 2016, Plaintiff submitted to VT-SGI her written Application for Employment and her written Interview Form. (Defendant's Facts, ¶ 16). In her Application for Employment, Plaintiff wrote that her "Reason for Leaving" Woodson Terrace was "Disagreement w/command staff." (*Id.*, ¶ 17, quoting Defendant's Exh. G). She further disclosed that she had been fired or asked to resign from a job "for not taking a report that the citizen did not want." (*Id.*, ¶ 20, quoting Defendant's Exh. G). On her Interview Form, Plaintiff wrote that her reason for leaving her last employment was a "Change in command staff", that she was unemployed at present due to a "Disagreement with command staff", and that she had "been discharged from a company for cause" "for not taking a report that the citizen stated repeatedly they didn't want." (*Id.*, ¶¶ 18, 19, 21, quoting Defendant's Exh. H). Neither Plaintiff's Application for Employment nor her Interview Form specifically mentioned Woodson Terrace's second stated reason for Plaintiff's discharge, *i.e.*, her allegedly false claim that someone in the Department deliberately cut her

ballistic vest on or about Dec. 11, 2015. (*Id.*, ¶ 23).[1]

On April 21, 2016, Plaintiff was interviewed for a job at VT-SGI by Forrest Garth. (Defendant's Facts, ¶ 24). Plaintiff informed Mr. Garth that Woodson Terrace said she was discharged due to an episode in which she failed to write a report because the involved citizens insisted they did not want her to do so. (*Id.*, ¶ 25). According to Defendant, Plaintiff never told any member of VT-SGI management or supervision that she was discharged by Woodson Terrace because of her false allegation that someone in the Woodson Terrace Department deliberately cut her ballistic vest. (*Id.*, ¶ 26).[2] Defendant contends it only learned of Plaintiff's falsifications when it received her employment file from Woodson Terrace on or about August 26, 2020, during the discovery phase of this litigation. (*Id.*, ¶ 28). Defendant further maintains VT-SGI would not have offered Plaintiff employment had it known the true reason for her discharge from Woodson Terrace, and further that it would have terminated her employment immediately had it learned while Plaintiff was in Defendant's employ that she falsified her Application for Employment and Interview Form. (*Id.*, ¶¶ 29-30).

---

[1] Plaintiff asserts the second reason for termination (regarding the ballistic vest being deliberately cut) was encompassed by her disclosures that she was unemployed due to a "Disagreement with command staff", and that "the reason [she] decided to leave [her] last employment" was "Change in command staff." (Plaintiff's Response to Defendant's Statement of Uncontroverted Material Facts in Support of Defendant's Motion for Partial Summary Judgment ("Plaintiff's Response to Defendant's Facts'), ¶ 23). Plaintiff further maintains she told Defendant's management, including Forrest Garth and Dave Warner, of the "situation surrounding her termination from the City of Woodson Terrace" when she completed her Application for Employment and Interview Form. (*Id.*; *see also* Plaintiff's Statement of Additional Uncontroverted Material Facts in Opposition to Defendant's Motion for Partial Summary Judgment ("Plaintiff's Additional Facts"), ¶ 1, citing Garner Dep. at 28:7-13, 31:6-19, 32:6-35:18, 36:17-37:15).

[2] Again, Plaintiff counters both that the allegation regarding the ballistic vest was encompassed by her given reasons for her unemployment, and that she told Forrest Garth and Dave Warner about the "situation surrounding her termination from the City of Woodson Terrace" when she completed her Application for Employment and Interview Form. (Plaintiff's Response to Defendant's Facts, ¶ 26).

VT-SGI hired Plaintiff as a PSO on or about August 1, 2016. (Defendant's Facts, ¶ 2). After DHS/FPS approves the fitness of a candidate for a PSO position, VT-SGI makes the offer of employment, and the offer is accepted, the newly hired PSO must successfully complete an approximately three-week long new hire training program, which includes firearm qualification. (*Id.*, ¶ 36). During the training program, a newly hired PSO must achieve a passing score of 80% of the 250 possible points (*i.e.*, 200 points) on the firearm qualification component. (*Id.*, ¶ 38).[3]

PSOs who successfully complete the training program ordinarily are placed on post. (Defendant's Facts, ¶ 39). Thereafter they must successfully qualify with the firearm every six months, by shooting a score of at least 80% of the 250 possible points on one of two attempts. (*Id.*). A PSO who fails to qualify with the firearm during his/her first semi-annual qualification session is required to undergo remedial training; thereafter he/she is afforded a second qualification session during which he/she must shoot a score of at least 80% of the 250 possible points. (*Id.*, ¶ 40). According to Defendant, newly hired PSOs who cannot successfully qualify with the firearm, as well as those PSOs who cannot successfully qualify every six months thereafter, are unqualified to stand post and thus automatically terminated by VT-SGI. (*Id.,* ¶ 41).[4]

Upon hiring, Plaintiff received full firearms training. (Defendant's Facts, ¶ 44). According to Defendant, Plaintiff received a failing score of 170 during her first firearms qualification test.

---

[3] The firearm qualification component is scored based on where the examinee's bullets strike a given target. (Defendant's Facts, ¶ 38).
[4] Defendant asserts that between August, 2015, and September, 2020, VT-SGI terminated from employment seventeen newly hired PSOs and eight other PSOs (including Plaintiff), for failing firearm qualification. (Defendant's Facts, ¶ 42). It further maintains that not a single PSO has been retained in employment after failing firearm qualification requirements. (*Id.*, ¶ 43). Plaintiff counters that she knew of several male employees of Defendant who received new guns and were able to re-qualify when they had issues with their guns while qualifying. (Plaintiff's Response to Defendant's Facts, ¶¶ 41, 43).

(*Id.*, ¶ 45, citing Defendant's Exh. M(1)-(11)).  She then passed with a score of 202, and requalified in February, 2017, August, 2017, and February, 2018, with scores of 200, 206, and 202, respectively. (*Id.*).  Plaintiff's re-qualification attempts also included failing scores of 152, 153, and 191, respectively. (*Id.*).[5]

Plaintiff's first attempt to re-qualify in the second half of 2018 brought two more failing scores of 170 and 180, resulting in the need for remedial training on August 6. (Defendant's Facts, ¶ 46, citing Defendant's Exh. M(1)-(11)).  On August 7, 2018, Plaintiff registered two more failing scores, 161 and 196. (*Id.*).  Following Plaintiff's failure, a representative of the union called VT-SGI and raised a complaint from Plaintiff regarding how her firearm functioned on August 7. (*Id.*, ¶ 49).[6]  VT-SGI maintains it then physically examined and tested the weapon, and found it to be in good working order. (*Id.*, citing Defendant's Exh. QQ(1)).  VT-SGI then discharged Plaintiff's employment, allegedly as an immediate and automatic result of her failure to complete weapons qualification. (*Id.*, ¶ 50).

Plaintiff filed her original Petition for Violations of the Missouri Human Rights Act in the Circuit Court of the City of St. Louis, Missouri, on or about December 10, 2019. (ECF No. 7). After Defendant removed the case to this Court, Plaintiff filed her First Amended Complaint ("FAC") on January 31, 2020, in which she lodges the following claims: gender discrimination,

---

[5] Plaintiff does not deny that Defendant's Exhibit M reflects the scores as above noted.  (Plaintiff's Response to Defendant's Facts, ¶ 45).  She claims the scores were not accurately documented at the times indicated, however, as Forrest Garth (who was in charge of reporting the scores) was not trustworthy. (*Id.*).
[6] The parties dispute whether Plaintiff herself complained to management about the firearm's functionality at any point during or immediately after the test. (*See* Defendant's Facts, ¶ 48 and Plaintiff's Response thereto).  Plaintiff asserts that she complained to management throughout the August 7, 2018, qualification regarding issues with her gun jamming, the cylinder opening, sparks flying off the gun and her issue with the grips. (Plaintiff's Additional Facts, ¶ 15).  She further maintains management of Defendant observed such issues. (*Id.*, ¶ 16).

in violation of the Missouri Human Rights Act ("MHRA") (Count I) and Title VII of the Civil Rights Act of 1964, as amended ("Title VII") (Count II); disability discrimination, in violation of the MHRA (Count I) and the Americans with Disabilities Act of 1990, as amended ("ADA") (Count III); and retaliation, in violation of the MHRA (Count I), Title VII (Count II), and the ADA (Count III). (ECF No. 18).

As stated above, Defendant filed the instant Motion for Partial Summary Judgment on March 10, 2021, claiming there exist no genuine issues of material fact and Defendant is entitled to judgment as a matter of law on all claims except Plaintiff's contention that she was discharged as a result of gender discrimination. (ECF No. 43).

## SUMMARY JUDGMENT STANDARD

The Court may grant a motion for summary judgment if, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The substantive law determines which facts are critical and which are irrelevant. Only disputes over facts that might affect the outcome will properly preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is not proper if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.*

A moving party always bears the burden of informing the Court of the basis of its motion. *Celotex*, 477 U.S. at 323. Once the moving party discharges this burden, the nonmoving party must set forth specific facts demonstrating that there is a dispute as to a genuine issue of material fact, not the "mere existence of some alleged factual dispute." Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 247. The nonmoving party may not rest upon mere allegations or denials of its pleadings. *Anderson*, 477 U.S. at 256.

In passing on a motion for summary judgment, the Court must view the facts in the light most favorable to the nonmoving party, and all justifiable inferences are to be drawn in its favor. *Anderson*, 477 U.S. at 255. The Court's function is not to weigh the evidence, but to determine whether there is a genuine issue for trial. *Id*. at 249.

## DISCUSSION

### I.  Disability Discrimination

When analyzing an ADA claim, in the absence of direct evidence of disability discrimination the Court applies the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under this framework, Plaintiff first must establish a prima facie case of discrimination, by demonstrating "(1) that the plaintiff was disabled within the meaning of the ADA; (2) that the plaintiff was qualified to perform the essential functions of the job [with or without a reasonable accommodation]; and (3) a causal connection between an adverse employment action and the disability." *Lipp v. Cargill Meat Solutions Corp.*, 911 F.3d 537, 544 (8th Cir. 2018) (internal quotation marks and citation omitted). If the plaintiff succeeds, the burden of production then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Id.* If the employer is able to do so, "[t]he burden then returns to the plaintiff to show that the employer's proffered reason was a pretext for discrimination." *Id.* (citation omitted).

In relevant part, both the ADA and the MHRA define "disability" with respect to an individual as "a physical or mental impairment that substantially limits one or more major life activities of such individual….or being regarded as having such an impairment." *See* 42 U.S.C. § 12102(1)(A), (C); Mo. Rev. Stat. § 213.010(5). The ADA further defines "major life activities" as including, but not limited to, "caring for oneself, performing manual tasks, seeing, hearing,

eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A).

In the instant case, Plaintiff's alleged disability entails having a smaller hand size. (FAC, ¶ 13). Plaintiff does not allege she has an underlying condition that left her with unusually small hands, however; rather, she testified during her deposition that her hands are of average size for an adult female. (*See* Defendant's Facts, ¶¶ 51, 52, citing Plaintiff's Dep. at 54:12-55:9). Furthermore, Plaintiff has never been to a doctor for her hand size, nor has she received a medical diagnosis of any kind regarding such. (*Id.*). Under these circumstances, the Court agrees with Defendant that Plaintiff fails to prove she suffers from the stated infirmity in the first instance.

Furthermore, even assuming Plaintiff suffers from the alleged disorder, the Court finds said condition does not constitute a "disability" under the terms of the MHRA or the ADA. As noted above, in order to qualify as a disability, the purported physical or mental impairment must "substantially limit[] one or more major life activities." *See* 42 U.S.C. § 12102(1)(A); Mo. Rev. Stat. § 213.010(5). When the major life activity under consideration is working, "a substantial limitation requires that plaintiff[] be 'unable to work in a broad class of jobs.'" *Shipley v. City of Univ. City*, 195 F.3d 1020, 1022 (8th Cir. 1999) (quoting *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 491, 119 S.Ct. 2139, 2151, 144 L.Ed.2d 450 (1999)).

> By its terms, the ADA allows employers to prefer some physical attributes over others and to establish physical criteria even if those criteria would substantially limit a person's employment opportunities if they were adopted by a large number of employers. It is not enough for a plaintiff to demonstrate that he is regarded as unable to perform a particular job or type of job. To be regarded as substantially limited in the major life activity of working, one must be regarded as precluded from a substantial class of jobs.

*Id.* at 1023 (internal quotation marks and citations omitted). *See also Smith v. City of Des Moines, Iowa*, 99 F.3d 1466, 1474 (8th Cir. 1996) (internal quotation marks and citations omitted)

("working does not mean working at a particular job of that person's choice and…an impairment that disqualifies a person from only a narrow range of jobs is not considered a substantially limiting one.").

In the instant case, Plaintiff claims only that her allegedly smaller hands precluded her from successfully discharging a particular type of firearm.[7]  The Court finds this contention insufficient to demonstrate that she is "precluded from a substantial class of jobs" (or regarded as such).  *See Shipley*, 195 F.3d at 1023.  Plaintiff thus fails to demonstrate that she suffers from a disability, and therefore cannot establish a prima facie case of disability discrimination.  This portion of Defendant's Motion for Partial Summary Judgment will therefore be granted.

## II.     Gender Discrimination[8]

Claims of gender discrimination under Title VII and the MHRA are also analyzed under the *McDonnell Douglas* burden-shifting framework.  Thus, Plaintiff first must establish a prima facie case of discrimination by demonstrating that she "'(1) is a member of a protected group; (2) was meeting the legitimate expectations of the employer; (3) suffered an adverse employment action; and (4) suffered under circumstances permitting an inference of discrimination.'" *Schaffhauser v. United Parcel Serv., Inc.*, 794 F.3d 899, 903 (8th Cir. 2015) (quoting *Davis v. Jefferson Hosp. Ass'n*, 685 F.3d 675, 681 (8th Cir. 2012)).  Once the plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Id.*  "If the employer meets this burden, the presumption of

---

[7] Plaintiff acknowledges that prior to her employment with Defendant, she was issued a semi-automatic SIG P229 as a police officer and did not experience problems firing it. (*See* Plaintiff's Memorandum in Opposition to Defendant's Motion for Partial Summary Judgment ("Plaintiff's Opp."), P. 13).
[8] As noted above, Defendant does not seek summary judgment on Plaintiff's claim that she was discharged as a result of gender discrimination.

discrimination disappears, requiring the plaintiff to prove that the proffered justification is merely a pretext for discrimination." *Id.* (internal quotation marks and citation omitted).

In its Motion for Summary Judgment, Defendant asserts Plaintiff cannot establish a prima facie case of gender discrimination with respect to Defendant's refusal to provide "female-cut" uniforms, because she fails to demonstrate that she suffered an adverse employment action. (Defendant's Memorandum in Support of its Motion for Partial Summary Judgment ("Defendant's Memo in Support"), PP. 11-13). Under Eighth Circuit law, "[a]n adverse employment action is defined as a tangible change in working conditions that produces a material employment disadvantage, including but not limited to, termination, cuts in pay or benefits, and changes that affect an employee's future career prospects…." *Jackman v. Fifth Judicial Dist. Dept. of Correctional Servs.*, 728 F.3d 800, 804 (8th Cir. 2013). "Minor changes in duties or working conditions, even unpalatable or unwelcome ones, which cause no materially significant disadvantage, do not rise to the level of an adverse employment action." *Wagner v. Campbell*, 779 F.3d 761, 766 (8th Cir. 2015) (internal quotation marks and citations omitted).

> A materially adverse action must be more disruptive than a mere inconvenience or an alteration of job responsibilities. There must be a material change in employment status—a reduction in title, salary or benefits. Although actions short of termination may constitute adverse employment actions…not everything that makes an employee unhappy is an actionable adverse action.

*Warr v. Hagel*, 14 F.Supp.3d 1244, 1251 (E.D. Mo. 2014) (internal quotation marks and citations omitted).

In her First Amended Complaint, Plaintiff alleges that "Defendant only orders male cut uniforms, boots and bullet proof vests, even though companies manufacture uniforms, boot[s] and vests designed to fit women's bodies." (FAC, ¶ 54). She maintains that although she complained about the uniforms several times, and requested a female uniform, Defendant refused to provide

one. (*Id.*, ¶ 55). During her deposition, Plaintiff testified regarding the uniform issue as follows:

> Q  Now, did the shirts that you were issued by VendTech cause you any problems in performing the duties and responsibilities of your job?
>
> A  Um, I mean, I worked—at the end, I worked 12 hours a day. There was no sitting. I was standing the whole day. So having a uniform that—unless you've worn a uniform like a police uniform, I don't think you'd understand. But it's very aggravating and uncomfortable because the—for instance, the—the armpits of the—the shirt came way down here, so it constantly rubbed, even with –even with a T-shirt underneath it.
>
> Q  But did the shirt, the way the shirt fit, hamper you in any way in doing the duties of your job?
>
> A  Um, like when I would have to—part of the time when I had to go qualify. I would have to tuck the jacket or—or whatever I had on, all the way in. Because any time you try to get something, or you try to get your radio out, the shirt would come with it because there was so much material, it wasn't able to be taught.
>
> Q  Did the pants that were issued to you adversely affect your ability to do your job?
>
> A  I mean, other than looking terrible and being called out on it, then no, it didn't.

(Plaintiff's Dep. at 171:6-172:6).[9]

As noted above, "minor changes in duties or working conditions, even unpalatable or unwelcome ones, which cause no materially significant disadvantage, do not rise to the level of an adverse employment action." *Jackman*, 728 F.3d at 804. Upon consideration, the Court finds that Plaintiff's complaint regarding her uniform being "aggravating and uncomfortable" does not rise to the level of an adverse employment action. *See Hajra v. Wawa, Inc.*, No. 15-7513 (RMB/AMD), 2018 WL 565574, at *7 (D.N.J. Jan. 26, 2018) (citation omitted) ("First, as to Plaintiff's alleged trouble ordering a new uniform, this does not rise to the level of an 'adverse employment action.' This was a mere inconvenience as opposed to a 'serious' and 'tangible'

---

[9] In her response to Defendant's motion, Plaintiff argues that the poorly fitted uniform affected her ability to operate her firearm and obtain a passing qualification score. (*See* Plaintiff's Opp., P. 10). As demonstrated above, however, Plaintiff's own testimony does not support this contention.

change to Plaintiff's 'compensation, terms, conditions, or privileges of employment.'"); *Gibson v. Atlantic Southeast Airlines*, No. 300CV2712X, 2002 WL 24259, at *3 (N.D. Tex. Jan. 7, 2002) (internal quotation marks omitted) ("Specifically, the adverse employment actions Gibson alleges are that she was not allowed to wear the proper uniform that was designed for her position….While these actions by ASA may not be liked by Gibson, they certainly do not rise to the level of an adverse employment action."). Plaintiff thus fails to establish a prima facie case of gender discrimination with regard to her uniform complaint, and so this portion of Defendant's Motion for Partial Summary Judgment must be granted.

### III.     Retaliation

In her First Amended Complaint, Plaintiff alleges she was retaliated against "for seeking an accommodation of a suitable firearm and appropriate uniforms." (FAC, ¶ 58). Title VII prohibits retaliation against an employee "because [s]he has opposed any practice made an unlawful employment practice by [Title VII], or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." *See* 42 U.S.C. § 2000e-3(a). *See also* Mo. Rev. St. § 213.070(2) (MHRA); 42 U.S.C. § 12203(a) (ADA). Pursuant to the *McDonnell Douglas* burden-shifting framework, the employee has the initial burden of establishing a prima facie case of retaliation, which she meets by showing that, "(1) [s]he engaged in protected conduct, (2) [s]he suffered a materially adverse employment action, and (3) the adverse action was causally linked to the protected conduct." *Pye v. Nu Aire, Inc.*, 641 F.3d 1011, 1021 (8th Cir. 2011) (citation omitted).[10] "If an employee establishes a prima facie case of retaliation, the burden shifts to the employer to articulate a legitimate, non-retaliatory

---

[10] *See also McGaughy v. Laclede Gas Co.*, 604 S.W.3d 730, 751 (Mo. App. 2020) (laying out same elements for MHRA retaliation claim); *Moses v. Dassault Falcon Jet-Wilmington Corp.*, 894 F.3d 911, 924 (8th Cir. 2018) (laying out same elements for ADA retaliation claim).

reason for its action; if the employer does so, the burden then shifts back to the employee to put forth evidence of pretext, the ultimate question being whether a prohibited reason, rather than the proffered reason, actually motivated the employer's action." *Id.* (internal quotation marks and citations omitted).

The Court assumes without deciding that Plaintiff has established a prima face case of retaliation.[11] Defendant responds that its decision to terminate Plaintiff's employment was automatic, because she failed the requisite firearm qualification. (Defendant's Memo in Support, P. 10). In other words, according to Defendant all PSOs are required to pass semi-annual firearm qualification examinations, and when Plaintiff failed her second attempt to qualify VT-SGI terminated her employment, just as it had terminated every other PSO who failed firearm qualification. (*Id.*). With this assertion, the Court finds Defendant successfully has articulated a legitimate, nondiscriminatory reason for the adverse employment action.

The burden thus shifts back to Plaintiff to show that the proffered reason was mere pretext for retaliation. She attempts to do so by asserting several male employees were issued new guns and permitted to re-qualify after having issues with their firearms during qualification. (Plaintiff's Opp., PP. 8-9). While Plaintiff's submission appears more relevant to her claim of gender discrimination, the Court nevertheless finds an issue of fact remains as to whether Defendant's proffered reason for termination was in fact a pretext for retaliation. Defendant's Motion for Summary Judgment on Plaintiff's claim of retaliation must therefore be denied.

**IV.   Back-Pay Damages**

---

[11] Defendant presents compelling evidence that Plaintiff cannot establish her prima facie case, as she testified during her deposition that she was retaliated against solely because she became a shop steward for her union, not because she engaged in activity protected by the MHRA, Title VII or the ADA. (*See* Defendant's Memo in Support, PP. 8-9).

Defendant finally asserts that Plaintiff's back-pay damages are cut off no later than August 26, 2020, the date on which VT-SGI learned she had falsified her Application for Employment by failing to disclose one of the reasons Woodson Terrace terminated her employment. (Defendant's Memo in Support, PP. 13-15). Specifically, Defendant maintains that had it learned at any point during her employment that Plaintiff falsified her application, it would have terminated her immediately.

In response, Plaintiff asserts that she informed members of Defendant's management, including Forrest Garth and Dave Warner, of the situation surrounding her termination from Woodson Terrace when she filled out her Application for Employment and Interview Form. (Plaintiff's Opp., PP. 11-12). She further maintains the stated reason for her firing regarding the ballistic vest incident was encompassed by her statements (on her Application for Employment and Interview Form) that the reason she was unemployed at present was due to a "Disagreement with command staff", and that "the reason [she] decided to leave [her] last employment" was "Change in command staff."

Upon consideration, the Court will deny this portion of Defendant's motion. Again, while Plaintiff's evidence is weak, the Court finds an issue of fact remains with respect to whether Defendant was aware of all the reasons for Plaintiff's termination from Woodson Terrace at the time it offered her employment.

## **CONCLUSION**

Accordingly,

**IT IS HEREBY ORDERED** that Defendant's Motion for Partial Summary Judgment (ECF No. 43) is **GRANTED** in part and **DENIED** in part, in accordance with the foregoing.


Dated this 21st Day of May, 2021.

                                                /s/ Jean C. Hamilton
                                                UNITED STATES DISTRICT JUDGE